UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DENNIS KELLER and CRYSTAL KELLER,

        Plaintiffs,

    v.

CITY OF STOCKTON, et al.,

        Defendants.

_____/

NO. CIV. S-04-1325 LKK/DAD

O R D E R

     Pending before the court are motions for judgment as a matter of law ("JMOL"), for a new trial, or for remittitur brought by the City of Stockton, Officer Kathryn Henderson, and Sergeant Ken Praegitzer ("defendants"). Plaintiffs, Dennis and Crystal Keller, oppose these motions. For the reasons set forth below, defendants' motion for remittitur is granted in part and denied in part. All other motions must be denied.

////

////

////

# I.

## FACTUAL BACKGROUND

On July 10, 2002, four-year-old Crystal Keller was taken from her day care provider's house in Sacramento by Stockton Police Officers Kathryn Henderson ("Henderson") and Ken Takeda ("Takeda") and placed at a children's shelter in Stockton.[1]  The removal was approved by Henderson's supervisor, Stockton Police Sergeant Ken Praegitzer ("Praegitzer").  Trial Transcript ("TT") at 41:8-9.  No warrant was obtained prior to removing Crystal.  TT at 42:4-5.  On July 9, 2004, plaintiffs filed suit against the City of Stockton ("City"), the County of San Joaquin, Child Protective Services worker Jose Romero, and Officers Henderson and Praegitzer, alleging unreasonable seizure of Crystal from the custody of her father.  Suit was premised on 42 U.S.C. § 1983 and alleged violations of the Fourth and Fourteenth Amendments to the U.S. Constitution.[2]  Specifically, plaintiffs alleged that defendants unreasonably seized Crystal and unlawfully interfered with their parent-child relationship.  Amend. Compl. at 4:23; TT at 426:4.

After a four-day trial, which ended on March 31, 2006, the jury found that the City, Henderson, and Praegitzer violated the Kellers' civil rights and awarded compensatory damages to Dennis Keller in the amount of $100,000 and to Crystal Keller in the amount of $500,000.  The jury awarded punitive damages against

---

[1]  Officer Takeda was not named as a defendant.

[2]  During discovery, plaintiffs dismissed the County of San Joaquin and Jose Romero.

2

Henderson and Praegitzer in the amount of $1,000,000 for each plaintiff, for a total of $2,600,000 in damages.  Special Verdict, filed March 31, 2006.  Defendants filed the present motions on April 17, 2006.

## II.

### ANALYSIS

Defendants make the following arguments:  (1) the court erred in not instructing the jury as to the rules for protective custody set forth in California Penal Code § 279.6; (2) the jury's compensatory damages are so high they constitute a denial of justice; (3) plaintiffs failed to adequately support their claim for punitive damages; (4) the jury's punitive damages award denied Sergeant Praegitzer and Officer Henderson due process; and (5) that the jury's punitive damages awards "fail due process excessiveness scrutiny."  Defs.' Mot. at 2.

Defendants urge the court to take one or more of the following actions: (1) order a new trial; (2) order plaintiffs to remit a portion of the compensatory damages or face a new trial on compensatory damages; (3) enter judgment as a matter of law in favor of Sgt. Praegitzer and Officer Henderson on plaintiffs' punitive damages claim; (4) order plaintiffs to remit a portion of the punitive damages or face a new trial on punitive damages.  Id. Below, the court addresses defendants' arguments in the context of the motions in which they are raised.

////

////

3

**A.   MOTION FOR JUDGMENT AS A MATTER OF LAW**

Praegitzer and Henderson move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 on the issue of punitive damages because they contend "there was insufficient evidence presented at trial to support the jury's conclusion that defendants acted either with malice or in reckless disregard of the Kellers' rights." Defs.' Mot. at 2, 11.  Defendants also assert that plaintiffs had the burden of establishing the appropriate amount of punitive damages and that they were required to present evidence regarding defendants' ability to pay punitive damages.  Defendants' arguments are unavailing.

**1.   <u>Standards</u>**

Defendants failed to move for JMOL before submission of the case to the jury.  By not doing so, they failed to comply with the procedural prerequisite for renewing their motion for JMOL after trial, and thus, the court is precluded from reviewing the sufficiency of evidence.  <u>Janes v. Wal-Mart Stores, Inc.</u>, 279 F.3d 883, 886-87 (9th Cir. 2002); <u>Farley Transp. Co. v. Santa Fe Trail Transp. Co.</u>, 786 F.2d 1342, 1345 (9th Cir. 1985).  The Ninth Circuit construes this requirement strictly.  <u>Farley</u>, 786 F.2d at 1346 ("the requirement that [a JMOL motion] be made at the close of all the evidence is to be strictly observed").

When a party loses its right to challenge the sufficiency of the evidence because it failed to file a procedurally-sound Rule 50(b) motion, the court is limited to reviewing the jury's verdict for plain error and should reverse only if such plain error would

4

result in a "manifest miscarriage of justice." <u>Janes</u>, 279 F.3d at 888 (9th Cir.2002). <u>See also</u> <u>Bird v. Glacier Elec. Coop., Inc.</u>, 255 F.3d 1136, 1148 (9th Cir. 2001)("We will review for plain or fundamental error [in a civil case] . . . where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question"). If such a finding is made, this court is still not required to reverse unless the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." <u>United States v. Cooper</u>, 173 F.3d 1192, 1203 (1999)(internal quotation and citations omitted).

As explained below, there is sufficient evidence from which a jury could conclude that punitive damages should be awarded.

### 2.   <u>A Reasonable Jury Could Conclude that Defendants Acted With Deliberate Indifference to Plaintiffs' Rights</u>

The court instructed the jury that "plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence," and that punitive damages are appropriate if the defendant's conduct "was malicious or in reckless disregard of plaintiff's rights."[3] <u>See</u> Jury Instructions, Instruction No. 31, filed March 31, 2006. The instruction further stated that "conduct is in reckless disregard of plaintiff's rights if, under the circumstances, it reflects complete indifference to

////

---

[3]   <u>See</u> <u>Dang v. Cross</u>, 422 F.3d 800, 805-808 (9th Cir. 2005) (Punitive damages may be awarded in 42 U.S.C. § 1983 cases if defendant's conduct was malicious, oppressive, or in reckless disregard of plaintiff's rights).

1  the safety and rights of others."[4] Id. Defendants contend that

2  there is no evidence from which a jury could conclude that

3  Praegitizer or Henderson acted with malice or in reckless disregard

4  of the Kellers' rights.  I cannot agree.

5       Defendants argue that they followed city policy and there was

6  no reason to believe that the policy deviated from the requirements

7  of the law.  The record, however, reflects that defendants were

8  aware of the state-mandated procedures and standards that they were

9  obligated to follow – specifically, Welfare and Institutions Code

10 § 305 – and that they failed to do so.  Defendants testified that

11 they understood the law governing their conduct as codified in

12 § 305 – that an "imminent threat" must be present.[5]  Henderson

13

14       [4]  This instruction complies with the Supreme Court's
    conclusion that punitive damage awards in § 1983 cases "did not
    require a showing of actual malicious intent; they permitted

15  punitive damage awards on variously stated standards of negligence,
    recklessness, or other culpable conduct short of actual malicious

16  intent.  Smith v. Wade, 461 U.S. 30, 45 (1983).

17       [5]  Section 305 of the California Welfare and Institutions Code
    provides in pertinent part:

18
    Any peace officer may, without a warrant, take into
19  temporary custody a minor:

20  (a) When the officer has reasonable cause for believing
    that the minor is a person described in Section 300,
21  and, in addition, that the minor has an immediate need
    for medical care, or the minor is in immediate danger of
22  physical or sexual abuse, or the physical environment or
    the fact that the child is left unattended poses an
23  immediate threat to the  child's health or safety.  In
    cases in which the child is left unattended, the peace
24  officer shall first attempt to contact the child's
    parent or guardian to determine if the parent or
25  guardian is able to assume custody of the child.  If the
    parent or guardian cannot be contacted, the peace
26  officer shall notify a social worker in the county

6

1  testified that a police officer is allowed to take a child without

2  getting a warrant only when he or she was in "imminent danger," and

3  in this case, sexual abuse.   Trial Transcript ("TT") at 114-115.

4  Henderson further testified that the removal of a child from a

5  parent should only happen in "exigent circumstances" and that in

6  this case, "it applied to sexual abuse," and could happen only

7  where "she [Crystal] had either been sexually abused or at risk of

8  being subjected to sexual abuse."   TT at 111-112.

9      Despite her knowledge of the governing standards, Henderson

10  removed Crystal based on one-year-old allegations against Dennis

11  Keller which were previously investigated by Child Protective

12  Services and found to be inconclusive.   TT at 108-111.   Henderson

13  conducted no independent investigation as to Dennis Keller's

14  parenting skills prior to removing Crystal from his care.   Id.

15  Because such evidence could lead a reasonable jury to conclude that

16  defendants were aware of the legal standards which govern the

17  removal of Crystal but that they nevertheless acted in "reckless

18  disregard" of the Kellers' rights, the court did not err in

19  allowing the punitive damages claim to go to the jury.

20      Defendants additionally assert that the punitive damages award

21  cannot stand because plaintiffs "made no effort to establish an

22  appropriate amount."[6]   Defs.' Mot. at 12.   Again, I cannot agree.

23  _____

24      welfare department to assume custody of the child.

25      [6]   As both parties agree, and as the court instructed the
    jury, plaintiffs bear the burden of establishing that punitive
    damages should be awarded, and the amount, by the preponderance of
26  the evidence.   See Ninth Cir. Jury Instructions, 7.5 Punitive

1   First, defendants have cited no binding authority, and the court

2   has found none, which requires plaintiffs to tell the jury exactly

3   how much they request in punitive damages.  Secondly, it appears

4   that plaintiffs met their burden of establishing the appropriate

5   amount of damages by providing evidence that an award of punitive

6   damages was appropriate, and then asking the jury to use their

7   judgment to determine the appropriate amount.[7]  While plaintiffs'

8   counsel made no mention of the specific amount during the trial,

9   he explained to the jury in his closing statement that the amount

10  is to be "determined with the use of reason and consideration of

11  the damages that we've been able to prove in this case."  TT at

12  399-400.  Plaintiffs' counsel also argued to the jury that

13  "defendants need to be told that what they did here is wrong so

14  they don't do it again," and that plaintiffs hoped "this case has

15  managed to serve a purpose to protect children in the future and

16  protect Crystal in the future."  TT at 399-400.  Based on

17  plaintiffs' instructions to the jury, the court holds that

18  plaintiffs made an effort to establish the appropriate amount of

19  damages as required under the law.  No plain error occurred in

20  allowing the punitive damages to be presented to the jury on this

21  account.

22  ////

23  ───────────────

    Damages.

24

25      [7]  The court's instructions explained to the jury as to the
    proposed nature of punitive damages, identified the damages as
26  punishment for civil wrongdoing, and explained that their
    imposition was not compulsory.

1    Finally, defendants contend that the punitive damages award
2    cannot stand because plaintiffs failed to present evidence of
3    defendants' financial condition, and that their motion for a new
4    trial must be granted on this account.  Defs.' Mot. at 12.
5    Defendants cite to a number of cases from other circuits and from
6    the California Supreme Court.  While it may be true that this is
7    a requirement in other jurisdictions, the Ninth Circuit has not
8    imposed any such requirement for supporting a punitive damages
9    award.  C.f. Morgan v. Woessner, 997 F.2d 1244, 1259 (9th Cir.
10   1993)(remanding only state law portion of punitive damages award
11   for the purpose of reconsidering the award in light of the fact
12   that plaintiff must provide evidence of defendant's financial worth
13   under California law); see also Hilao v. Estate of Marcos, 103 F.3d
14   767, 781-82 & n.7 (9th Cir. 1996)(approved a jury's discretion to
15   consider financial condition as one relevant factor in awarding
16   punitive damages).

17   For all the reasons discussed above, no plain error was
18   committed and the court must accordingly deny defendants' motion
19   for JMOL.

20   **B.  MOTION FOR A NEW TRIAL**

21   Defendants request a new trial for two errors that they
22   contend were made by the court – namely, that the court erred in
23   declining to give defendants' special jury instruction based on
24   California Penal Code § 279.6 and for providing a verdict form that
25   "substantially confused the issue of punitive damages."  Defs.'
26   Mot. at 9, 12.  Defendants' arguments are unavailing.

9

1.   **Standards**

Defendants' failure to move for judgment as a matter of law does not preclude their motion for a new trial under Fed. R. Civ. P. 59.   Freund v. Nycomed Amersham, 347 F.3d 752, 765 (9th Cir. 2003).   The Ninth Circuit has articulated a number of different circumstances that warrant a new trial, stating that district courts have discretion to grant Rule 59 motions when the verdict is "against the clear [or "great"] weight of the evidence," when the evidence shows that the jury has reached a "seriously erroneous result," and/or when the evidence shows that acceptance of the verdict would cause a "miscarriage of justice." Id.; EEOC v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir. 1997)(internal quotations and citations omitted); see also Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987)(Rule 59 motion for a new trial should be granted if "the verdict is against the clear weight of the evidence . . . .   The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party"); Roy v. Volkswagon of America, 896 F.2d 1174 ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.")(citation omitted).   While the court undoubtedly has discretion to assess the evidence based on these various standards ("against the clear weight of the evidence,"

1    "seriously erroneous result," "miscarriage of justice"), the

2    standard for finding insufficient evidence warranting a new trial

3    remains stringent.

4        **2.  <u>Special Jury Instruction Based on Penal Code § 279.6</u>**

5        Defendants maintain that the court erred when it declined to

6    give defendants' special jury instruction based on Penal Code

7    § 279.6.  They argue that Section 279.6 "provided a complete

8    defense to Plaintiffs' federal claims," Defs.' Mot. at 9, and that

9    the court's refusal to give this instruction "deprived the jury of

10   important legal considerations probative of the reasonableness of

11   the Defendants' actions."  Defs.' Repl. at 5.

12       Defendants' proposed instruction stated:

13   (a) A law enforcement officer may take a child into
     protective  custody  under  any  of  the  following
14   circumstances:
         (1) It reasonably appears to the officer that a
15   person is likely to conceal the child, flee the
     jurisdiction  with  the  child,  or,  by  flight  or
16   concealment, evade the authority of the court.
         (2) There is no lawful custodian available to take
17   custody of the child.
         (3)  There  are  conflicting  custody  orders  or
18   conflicting claims to custody and the parties cannot
     agree which party should take custody of the child.
19
     (b) When a law enforcement officer takes a child into
20   protective custody pursuant to this section, the officer
     shall do one of the following:
21       (1) Release the child to the lawful custodian of
     the child, unless it reasonably appears that the release
22   would cause the child to be endangered, abducted, or
     removed from the jurisdiction.
23       (2) Obtain an emergency protective order ordering
     placement of the child with an interim custodian who
24   agrees in writing to accept interim custody.
         (3) Release the child to the social services agency
25   responsible for arranging shelter or foster care.
         (4)  Return  the  child  as  ordered  by  a  court  of
26   competent jurisdiction.

                                  11

1    (California Penal Code section 279.6)

2 Def.'s Supp. Jury Instructions, filed March 27, 2006.[8]

3    First, the court notes that the proffer of the instruction was

4 untimely.  The court instructed the parties in its February 23,

5 2006 Pretrial Order that counsel's "specific jury instructions

6 shall be filed fourteen (14) calendar days prior to trial."

7 Defendants, however, did not submit the proposed instruction at

8 issue until the day before trial.[9]  As the court admonished counsel

9 during oral argument, such deadlines provide the court with an

10 opportunity to research difficult questions raised by the proposed

11 instructions.  Defendants' failure to timely submit this

12 instruction deprived the court of the appropriate opportunity to

13 consider its applicability. Nevertheless, the court considered the

14 instruction during trial, and declined to provide it to the jury

15 for a number of reasons stated on the record and further elaborated

16 in this order.  TT at 253.

17    As the court explained to the parties during trial, the jury

18 instruction was inappropriate because the evidence overwhelmingly

19 demonstrated that defendants relied on Welfare and Institutions

20 ////

21

22    [8]  It appears defendants' proposed instruction was derived
verbatim from California Penal Code § 279.6(a)(1), (2), (3) and
23 (b)(1), (2), (3), (4).

24    [9]  Local Rule 51-163 provides that "*[u]nless the Court
otherwise orders or permits*, requested jury instructions in civil
25 and criminal actions shall be filed with the Clerk and copies
served on all parties at the opening of the trial (emphasis
26 supplied).

1  Code in understanding the scope of their duties.[10]   TT at 253.

2  Defendants' testimony consistently demonstrated that defendants

3  relied on California Welfare and Institutions Code § 305, which

4  allows warrantless removal of a child when it is reasonable to

5  believe the child is in "immediate danger of physical or sexual

6  abuse."[11]   Officer Henderson testified that she believed the

7  standard in determining "whether children should be removed from

8  their parents" was in "exigent circumstances," and that, "in this

9  particular case it applied to sexual abuse, that [Crystal] had

10  either been sexually abused or at risk of being subjected to sexual

11  abuse." TT at 111-112. Henderson additionally stated that section

12  305 allowed for the warrantless removal of a child, when there was

13  "reasonable cause to believe . . . that she had suffered sexual

14  abuse, and was at a substantial risk to incur sexual abuse."   TT

15  at 114-115.   Praegitzer explained that he was concerned that

16  _____

17      [10]   The court notes that defendant Praegitzer testified that
officers were required to know both section 305 of the Welfare and
18  Institutions Code and section 279.6 of the Penal Code prior to
removing a child.  TT at 229.  Defendants also argued during oral
19  argument that Penal Code Section 279 is referred to in the
Department's policies, which states that "[o]fficers, you need to
20  be familiar with these statutes."  As the court noted during oral
argument, however, and as this order further explains, there was
21  little, if any, evidence that defendants operated under the
authority of Penal Code § 279.6.

22
      [11]   Section 305 states in pertinent part: "Any peace officer
23  may, without a warrant, take into temporary custody a minor: (a)
When the officer has reasonable cause for believing that the minor
24  is a person described in Section 300, and, in addition, that the
minor has an immediate need for medical care, or the minor is in
25  immediate danger of physical or sexual abuse, or the physical
environment or the fact that the child is left unattended poses an
26  immediate threat to the child's health or safety."

1  Crystal was in imminent danger of physical harm based on

2  "allegations in the report" and "past allegations of abuse."  TT

3  at 207-208.  Finally, Officer Richard Leslie testified that the

4  policy regarding welfare checks for children only referenced

5  section 305.  TT at 235, 247, 248.

6       Although there was some testimony from defendants regarding

7  Dennis Keller's potential concealment of Crystal, a permissible

8  ground for removal under the penal code at issue, the evidence

9  demonstrates that it was not a realistic threat.  Henderson

10 testified that the concealment of Crystal "could be an issue"

11 because Crystal "was not found at the preschool where she was

12 supposed to be," and because Dennis Keller "wasn't the custodial

13 parent at the time as defined by court order."  TT at 101, 117,

14 129.  Likewise, Takeda testified that Henderson was concerned that

15 they did not know where Crystal was, were unable to contact Dennis

16 Keller, and thought he was concealing Crystal from her mother.  TT

17 at 181-182.  Henderson, however, had no difficulty in finding

18 Crystal at her caretaker's house and both Henderson and Tekada

19 testified that they had no concerns about Crystal's physical

20 condition or the competency of her caretaker, Debra Morie

21 ("Morie"), and that Morie's house was "in an appropriate condition

22 for a child."  TT at 125, 184.  Henderson further testified that

23 she was aware that another Stockton police officer decided Dennis

24 Keller should care for Crystal while the allegations of sexual

25 abuse against Crystal's mother were being investigated.  TT at 121.

26 ////

1  The investigation report notes taken by Henderson also state that

2  Crystal was taken into custody "due to the fact that [Crytal's

3  mother] was allegedly molesting Crystal and Dennis' court

4  visitation was not in effect."  TT at 146:2-4.  Such evidence

5  undermines defendants' present assertions that they were concerned

6  about Dennis Keller's intent to conceal his daughter when she was

7  not returned to her mother pursuant to the joint custody order.[12]

8       Even though defendants assert in their reply brief and during

9  oral argument that the court's refusal to provide the instruction

10  resulted in error justifying a new trial, the evidence demonstrates

11  that defendants removed Crystal based on the standards set forth

12  in the Welfare and Institutions Code, not under the California

13  Penal Code.  Indeed, "[a] trial judge is given substantial latitude

14  in tailoring the instructions so long as they fairly and adequately

15  cover the issues presented" when "evaluated in the context of the

16  whole trial." United States v. Marabelles, 724 F.2d 1374, 1382-83

17  (9th Cir. 1984).  "A party is entitled to an instruction about his

18  or her theory of the case if it is supported by law and has

19  foundation in the evidence."  Jones v. Williams, 297 F.3d 930, 934

20  (9th Cir. 2002).  Here, however, providing the penal code jury

21  instruction was inappropriate since it has no "foundation in the

22  _____

23       [12]  Nor was there any evidence that Mr. Keller's conduct fell
   within the scope of the other provisions of section 279.6.  There
24  was a lawful custodian available to take Crystal because it was
   Crystal's mother, not Dennis Keller, who was being investigated for
25  sexual abuse.  Finally, there were no conflicting custody orders
   or disagreement between the parties regarding who should take the
26  child.

evidence" and there were no facts to support that defendants were operating under the scope of Penal Code § 279.6.[13]  Consequently, defendants' argument that this instruction would have either provided a defense or assisted the jury with assessing the reprehensibility of defendants' conduct must be rejected.

### 3.  <u>Jury Verdict Form</u>

Defendants further maintain that they are entitled to a new trial because the jury verdict form was misleading and denied Praegitzer and Henderson due process. Defs.' Mot. at 12.  Assuming arguendo that the verdict does not support a new trial, the verdict form explained that if the jury found for the plaintiff "as to any one of the defendants" it had to answer two questions:

> What amount of compensatory damages do you award?
> What amount, if any, of punitive damages do you award?

Special Verdict, filed March 31, 2006; Defs.' Mot. at 7.

Defendants assert that the verdict form did not make it clear that punitive damages were only appropriate against Praegitzer and Henderson as individuals, and that punitive damages could not be awarded against the City. Defs.' Mot. at 8.  As a result, defendants argue, the jury believed that it could impose punitive damages against the city, not the individual officers and, therefore, based the award on the City's ability to pay.  Defs.' Mot. at 12.

////

---

[13]  The court assumes, without deciding, that the Penal Code provision was consonant with the United States Constitution.

1    In support of their argument, defendants tender the

2 declarations of several jurors to demonstrate that the jury was

3 confused and did not understand who punitive damages could be

4 awarded against.  Defs.' Mot. at 8, 13.  These declarations are

5 inadmissible under Rule 606(b) of the Federal Rules of Evidence and

6 will not be considered by the court.[14]  As the Ninth Circuit has

7 held, "[a]fter a verdict is returned a juror will not be heard to

8 impeach the verdict when his testimony concerns his

9 misunderstanding of the court's instructions." United States v.

10 Stacey, 475 F.2d 1119, 1121 (9th Cir. 1973).  In addition, "it is

11 improper and unethical for lawyers to interview jurors to discover

12 what was the course of deliberation of a trial jury" and "neither

13 a trial court nor an appellate court has the authority to inquire

14 into the jury's decisional processes." Smith v. Cupp, 457 F.2d

15 1098, 1100 (9th Cir. 1972).  Only when there is an allegation of

16 juror misconduct is juror testimony admissible regarding

17 "extraneous influences on the deliberation process." Hard v.

18 Burlington N. Railroad, 812 F.2d 482, 486 (9th Cir. 1987); see also

19

20    [14]  Federal Rule of Evidence 606(b) states: "[u]pon an inquiry
into the validity of a verdict or indictment, a juror may not
21 testify as to any matter or statement occurring during the course
of the jury's deliberations or to the effect of anything upon that
22 or any other juror's mind or emotions as influencing the juror to
assent to or dissent from the verdict or indictment or concerning
23 the juror's mental processes in connection therewith, except that
a juror may testify on the question whether extraneous prejudicial
24 information was improperly brought to the jury's attention or
whether any outside influence was improperly brought to bear upon
25 any juror.  Nor may a juror's affidavit or evidence of any
statement by the juror concerning a matter about which the juror
26 would be precluded from testifying be received for these purposes."

1  <u>Economou v. Little</u>, 850 F. Supp. 849, 852 (N.D. Cal. 1994) ("The

2  Ninth Circuit requires a post-verdict inquiry into juror

3  deliberations only if the court learns of a possible incident of

4  juror misconduct.").

5      Moreover, any objection to the verdict form was arguably

6  waived.  Defense counsel was given the form with the jury

7  instructions but failed to object when asked on the record.[15]  Even

8  if defendants did not waive their objection, it is unlikely there

9  was any juror confusion due to counsels' arguments to the jury.

10 Plaintiffs' counsel explained during his opening argument that

11 plaintiffs were "asking for punitive damages against the officers."

12 TT at 30.  He reiterated this point in his closing argument,

13 stating that "[w]e've asked for punitive damages against the two

14 individual defendants."  TT at 398.  Plaintiffs' counsel made

15 explicit that "[t]hese damages are not available against the City

16 of Stockton for legal reasons."  TT at 398.

17     Similarly, defense counsel clarified during their closing

18 argument that "[p]laintiffs are asking for punitive damages against

19 Ken Praegitzer and Kathryn Henderson."  TT at 398.  Any possibility

20 of jury confusion was mitigated by both plaintiffs' and defendants'

21 counsel's clarifications to the jury.  Thus, any error committed

22 by the court through the jury verdict form was harmless error.

---

23     [15]  Of course, had the defendants voiced any objection to the

24 form, it was readily modifiable to resolve any confusion.  While
   the court has no way of knowing whether defendants were

25 "sandbagging," the present record demonstrates the reason that
   objection must first be made to the trial court for the objection

26 to be preserved.

1  Where a motion for a new trial is based on allegations that the

2  court committed error, the error must be harmful to warrant a new

3  trial.  See Fed. R. Civ. P. 61.  A new trial is not justified if

4  the error was harmless.  Glanzman v. Uniroyal, Inc., 892 F.2d 58,

5  61 (9th Cir. 1989)("If an error does 'not affect the substantial

6  rights of the parties' it will be deemed 'harmless' and not grounds

7  for reversal or appeal."  This concept under Rule 61 applies at

8  trial and on appeal)(citation omitted).  In the case at bar, any

9  error committed by the court was harmless.  Defendants' motion for

10 a new trial based on the jury verdict form must be denied.

11 **C.  MOTION FOR REMITTITUR**

12     Defendants urge the court to remit the compensatory and

13 punitive damages awarded to plaintiffs, contending that they are

14 unsupported by the evidence. The court considers defendants'

15 contentions below.

16     **1.   Standards**

17     Where an award of damages is grossly excessive or monstrous,

18 clearly not supported by the evidence, or only based on speculation

19 or guesswork, and gives rise to an inference that "passion and

20 prejudice" tainted the jury's finding of liability, a new trial may

21 be in order.  Snyder v. Freight, Constr., Gen. Drivers,

22 Warehousemen & Helpers, Local No. 287, 175 F.3d 680, 689 (9th Cir.

23 1999)(citing Los Angeles Memorial Coliseum Comm'n v. National

24 Football League, 791 F.2d 1356, 1360 (9th Cir. 1986); Seymour v.

25 Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir. 1987)).

26 ////

1   However, where there is no evidence that passion and prejudice

2   affected the liability finding, remittitur of damages "which the

3   court considers justified" is an appropriate method of reducing an

4   excessive verdict.  <u>Snyder</u>, 175 F.3d at 689; <u>Seymour</u>, 809 F.2d at

5   1387.  When the court, after viewing the evidence concerning

6   damages in a light most favorable to the prevailing party,

7   determines that the damages award is excessive, it has two

8   alternatives: (1) it may grant defendant's motion for a new trial;

9   or (2) deny the motion conditional upon the prevailing party

10  accepting a remittitur.  <u>Fenner v. Dependable Trucking Co.</u>, 716

11  F.2d 598, 603 (9th Cir. 1983). The prevailing party is given the

12  option of either submitting to a new trial or of accepting a

13  reduced amount of damage which the court considers justified.  <u>Id</u>.

14  If the prevailing party does not consent to the reduced amount, a

15  new trial must be granted.  <u>Id</u>.  The proper amount of a remittitur

16  is the maximum amount sustainable by the evidence.  <u>D & S Redi-Mix</u>

17  <u>v. Sierra Redi-Mix & Contracting Co.</u>, 692 F.2d 1245, 1249 (9th Cir.

18  1982); <u>see also</u>, 11 Wright, Miller & Kane, <u>Federal Practice and</u>

19  <u>Procedure: Civil 2d</u> § 2815 (stating the "maximum amount" theory of

20  remittiturs "is the only theory that has any reasonable claim of

21  being consistent with the Seventh Amendment).

22      **2.  <u>Compensatory Damages</u>**

23      In reviewing a jury's damages award, the court must uphold the

24  jury's "finding of the amount of damages unless the amount is

25  'grossly excessive or monstrous,' clearly not supported by the

26  evidence, or 'only based on speculation or guesswork.' " <u>Handgards,</u>

1    <u>Inc. v. Ethicon, Inc.</u>, 743 F.2d 1282, 1297 (9th Cir. 1984) (quoting

2    <u>Blanton v. Mobil Oil Corp.</u>, 721 F.2d 1207, 1216 (9th Cir. 1983),

3    <u>cert. denied</u>, 471 U.S. 1007 (1985)), <u>cert. denied</u>, __ U.S. __, 105

4    S.Ct. 963 (1985).  In § 1983 cases such as the one at bar, damages

5    are meant to compensate persons for injuries that are caused by the

6    deprivation of constitutional rights.  <u>Memphis Cmty. Sch. Dist. v.</u>

7    <u>Stachura</u>, 477 U.S. 299, 307 (1986)(citations omitted).

8    Compensatory damages may include not only out-of-pocket loss and

9    other monetary harms, but also such injuries as impairment of

10   reputation, personal humiliation, and mental anguish and suffering.

11   <u>Id</u>.

12       Defendants contend that the jury's compensatory awards of

13   $100,000 to Dennis Keller and $500,000 to Crystal Keller were

14   excessive and were so high "as to shock the judicial conscience and

15   constitute a denial of justice."  Defs.' Mot. at 9 (citations

16   omitted).  "[V]iewing the evidence concerning damages in a light

17   most favorable to the prevailing party," as the court must, <u>Fenner</u>,

18   716 F.2d at 603, the jury's compensatory damages were supported by

19   the evidence and not "grossly excessive or monstrous."  <u>Los Angeles</u>

20   <u>Memorial Coliseum Comm'n</u>, 791 F.2d at 1360.

21       Defendants emphasize that the court limited Dennis Keller's

22   compensatory awards to five days, <u>see</u> Jury Instruction No. 28,

23   filed March 31, 2006, that he suffered "no physical injuries," and

24   that "five days of distraction . . . cannot be worth $100,000."

25   Defs.' Mot. at 9-10.  They make similar arguments with respect to

26   Crystal Keller, explaining that Crystal suffered "no physical

1   harm," that her fear of officers is due to other causes, and that

2   she is now a well-adjusted child, "performing well at school, has

3   lots of friends and plays well with others."[16]  Defs.' Mot. at 10-

4   11.  Their attempts at minimizing the injury and thus the

5   compensatory damages the jury found for plaintiffs are not

6   successful.  As noted above, compensatory damages for § 1983 cases

7   may also include non-physical injuries such as impairment of

8   reputation, personal humiliation, and mental anguish and suffering.

9   See Memphis Cmty. Sch. Dist. v. Stachura, supra.

10      As plaintiffs point out, the record is replete with testimony

11   that defendants' actions affected the bond between Crystal and

12   Dennis Keller and caused him mental anguish and emotional trauma.

13   See, e.g., TT at 292 (Dennis Keller "couldn't concentrate" at work

14   and in general, he had planned her fifth birthday and felt he had

15   "somehow failed [his] daughter"); 257 (Dennis Keller "felt badly

16   he couldn't protect her.").  The record also reflects that

17   defendants' actions affected Crystal's emotional well-being and her

18   relationship with her father.   See, e.g., TT at 54 (Crystal

19   "worr[ie]s a lot . . . about getting taken again . . ." and is

20   "scared and terrified" that "[she] would never see [her] dad

21   again"); 55 (defendants' removal of Crystal affected her schoolwork

22   and concentration," and she is scared that police will "come and

23   swipe [her].").  Where, as here, the compensatory damages verdict

24

25      [16]  Defendants assert that Crystal's anxiety predated July 10,
     that she has had only "two recurring nightmares," and that some of
26   her anxiety derives "from the time she witnessed her mother's
     arrest."  Mot. at 10.

22

1 for Dennis and Crystal Keller finds substantial support in the

2 record and lie within the range sustainable by the proof, the court

3 will not play "Monday morning quarterback" and "supplant the jury's

4 evaluation of the complex and conflicting evidence with its own."

5 <u>Los Angeles Memorial Coliseum Comm'n</u>, 791 F.2d at 1366 (citations

6 and internal quotations omitted).  Defendants' request to remit

7 plaintiffs' compensatory damages must be denied.

8     **3.  <u>Punitive Damages</u>**

9     The jury imposed $2 million in punitive damages against

10 defendants Praegitzer and Henderson, $1 million for each plaintiff.

11 Defendants contend that the jury's punitive damages are excessive

12 and that it furthers "no legitimate purpose and constitutes an

13 arbitrary deprivation of property."  Defs.' Mot. at 13 (citation

14 omitted).  Defendants urge the court to order plaintiffs to remit

15 a substantial portion of the punitive damages or face a new trial

16 on punitive damages.  Defs.' Mot. at 18.  Plaintiffs, on the other

17 hand, contend that the awards of punitive damages are not

18 constitutionally excessive.  The court will not upset the jury's

19 finding that Crystal Keller is entitled to $1 million in punitive

20 damages.  The court concludes, however, that the jury's award of

21 $1 million for Dennis Keller is excessive.

22     Both parties correctly point out that <u>BMW of North Am., Inc.</u>

23 <u>v. Gore</u>, and <u>State Farm Mut. Auto. Inc. Co. v. Campbell</u> provide the

24 standards governing the court's determination of punitive damages.

25 ////

26 ////

Punitive damages can be imposed to further the interest of "punishing unlawful conduct and deterring its repetition." BMW of North Am., Inc. v. Gore, 517 U.S. 559, 568 (1996); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). But a punitive damages award that is "grossly excessive" can be in violation of the Due Process Clause of the Fourteenth Amendment. Gore, 517 U.S. at 568. A grossly excessive award "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." Campbell, 538 U.S. at 417 (citing Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 42 (O'Connor, J., dissenting)). They also violate "elementary notions of fairness" by not providing a person with fair notice "of the severity of the penalty that a State may impose." Campbell, 538 U.S. at 417.

Gore and Campbell provide three "guideposts" for determining whether a punitive damages award is unconstitutionally excessive:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages awarded; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

Campbell, 538 U.S. at 418 (citing Gore, 517 U.S. at 575). The court considers in turn these factors with respect to the instant case.

## I.   Reprehensibility

"The most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575. The Court in Campbell instructed

24

1 courts to determine reprehensibility by considering whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

538 U.S. at 419 (citing Gore, 517 U.S. at 575); see also Bains LLC v. ARCO Prods. Co., 405 F.3d 764, 775 (9th Cir. 2005)(explaining Campbell "enumerates the factors to be used when evaluating the reprehensibility of a defendant's conduct").

The existence of one factor in favor of a plaintiff does not in itself support a finding of reprehensibility and, ultimately, of a punitive damages award. Campbell, 538 U.S. at 419; see also Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 422 F.3d 949, 959-960 (9th Cir. 2005) (finding defendant's conduct "on the balance" was sufficiently reprehensible to warrant punitive damages).

The Ninth Circuit has noted that neither Gore or Campbell addressed the issue of reprehensible conduct by a public official. S. Union Co. v. Southwest Gas Corp., 415 F.3d 1001, 1011 (9th Cir. 2005).[17]  Nevertheless, given the facts of this particular case,

_____

[17]  In the context of discrimination claims under 42 U.S.C. § 1981, given the public trust placed in officials, "[t]he redress of racial, religious or gender discrimination has been treated as a special area of public concern where affront to human rights may require high punitives."  Id. (citing Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1043 (9th Cir. 2003), cert. denied, 541 U.S. 902 (2004)).  By analogy, cases brought under 42 U.S.C. § 1983 against public officials and which deal with the parent-child relationship and the deprivation of their civil rights may also be a "special area of public concern," especially where, as

1  the court finds that defendants' conduct constituted sufficient

2  reprehensibility to warrant punitive damages.

3      The court firmly believes that the jury awarded punitive

4  damages because defendants' actions "evinced an indifference to or

5  a reckless disregard of the health or safety of others" and that

6  the conduct at issue most likely "involved repeated actions."  In

7  addition to the trial testimony cited on pages 5-7 of this order,

8  see supra, Richard Leslie, a sergeant with the City of Stockton,

9  testified that the Police Chief Edward J. Chavez provided a written

10 policy on the removal of children from their home, which directs

11 officers to interview the reporting party, victim, parents or

12 guardians, the suspect, other persons who can contribute to the

13 child or family, and paramedics/ambulance personnel before removing

14 a child.  TT at 238.  Henderson failed to follow this department

15 protocol and interviewed none of these individuals removing

16 Crystal.  TT at 105, 107, 110.

17     Leslie also testified that he believed an "officer has a duty

18 to investigate surrounding circumstances to determine the

19 reliability of allegations" regarding sexual abuse against a

20 parent.  TT at 243.  The evidence at trial revealed that defendants

21 failed to appropriately investigate the circumstances before

22 removing Crystal.  Henderson testified that she removed Crystal

23 based on "information she had," on "some allegations against Dennis

24

25 here, defendants repeatedly admitted that they have never obtained
   a warrant to remove a child from his or her parents.  TT at 220,
26 229, 240.

1   Keller in Officer Alverson's report and based on CPS attachments,"
2   and that she did not independently determine the reliability of
3   such allegations.  TT at 108-111.  The record also suggests that
4   the reasons for removing Crystal were never clear to defendants,
5   much less made clear to plaintiffs.  According to Dennis Keller,
6   Henderson stated to him on the phone at the time of his daughter's
7   removal that the removal was prompted by his "breaking [his] court
8   ordered visitation with the mother."  TT at 291.  Finally,
9   Henderson testified that the "decision to remove Crystal" was
10  ultimately made "at Debra Morie's house," suggesting that the
11  decision was not thoroughly contemplated.  Indeed, the court
12  concludes that a jury could well conclude that the removal was an
13  arbitrary exercise of power.  Put directly, a reasonable jury could
14  conclude that defendants' conduct constituted an unreasonable
15  arrogation of power and that such actions demonstrated an
16  indifference to the health and safety of plaintiffs.  Multiple
17  witnesses testified that plaintiffs were not made aware of the
18  removal in advance and that defendants did little to ameliorate the
19  difficult situation.  Dennis Keller testified that he spoke to
20  Crystal when defendants were at Debra Morie's house and that she
21  "was begging me and crying and screaming not to let the police take
22  her," and that she was "totally afraid that [defendants] were going
23  to take her daddy away."  TT at 290.  Dennis Keller also testified
24  that, as noted above, "all [he] was told" was that the removal was
25  due to his "breaking [his] court ordered visitation with the
26  mother," not that defendants believed Crystal was in danger of

27

1  sexual abuse, as defendants testified to during trial.  TT at 291.

2  Debra Hamilton testified that Debra Morie, Crystal's babysitter at

3  the time of her removal, was "hysterical," "screaming and crying

4  into the phone" when Crystal was removed, and that at the time,

5  Dennis Keller "[d]idn't know what his rights were."  TT at 256-257.

6  Crystal Keller testified that she "didn't know what was going on"

7  when defendants came to remove her, and that she was "scared and

8  terrified" when Debra Morie told her she needed to go with

9  defendants.  TT at 52.

10       Finally, defendants testified that a warrant has "never" been

11 issued when the Stockton police department removed a child from his

12 or her home.  Such a policy involves "repeated actions," rather

13 than an isolated incident.[18]  Leslie testified that officers in

14 Stockton were not "trained to get warrants in these types of

15 cases," and that in his twenty-two years in the Department,

16 defendants have "never" obtained a warrant to remove a child from

17 a home.[19]  TT at 239-240.  Praegitzer similarly stated that he was

18

19       [18]  As explained above, Campbell instructed courts to
   determine reprehensibility by considering whether, inter alia, the
20 conduct involved repeated actions or was an isolated incident.  538
   U.S. at 419.

21       [19]  Significantly, when the court questioned Sergeant Leslie
   whether his officers were trained "that the Fourteenth Amendment
22 to the Constitution of the United States bears upon the question
   of whether or not a child may be removed from his . . . or her
23 parents," he jocularly answered, "Do we know there is a
   Constitution?"  TT at 249.  It was not until the court admonished
24 Sergeant Leslie that the court did not ask the question in jest
   that he responded that his officers were trained with such
25 knowledge.  Such demeanor during trial, no doubt, supports the
   jury's conclusion that defendants demonstrated an indifference or
26 reckless disregard for plaintiffs' rights in the removal of Crystal

28

1  not aware of any situation where an officer obtained a warrant to

2  remove a child.  TT at 220.  In Praegitzer's experience, he had

3  "never" obtained a warrant to remove a child.  TT at 229.

4  Henderson testified that at the time of Crystal's removal she "had

5  no experience" with "any requirement that a police officer obtain

6  a warrant to remove a child from the parents [sic] custody."  TT

7  at 113.

8       In sum, the record substantially supports that defendants'

9  conduct was sufficiently reprehensible, "the most important indicum

10 of reasonableness of a punitive damages award."  <u>Gore</u>, 517 U.S. at

11 575.

12           **ii.  <u>Ratio</u>**

13      The "most commonly cited" consideration of a punitive damages

14 award is "its ratio to the actual harm inflicted on the plaintiff."

15 <u>Gore</u>, 517 U.S. at 580.  Punitive damages must bear a "reasonable

16 relationship" to compensatory damages.  <u>Id.</u>  In the instant case,

17 the punitive damages award for Crystal Keller bears a reasonable

18 relationship to the compensatory damages awarded her.  The punitive

19 damages award for Dennis Keller, however, fails to satisfy due

20 process and must, indeed, be remitted.

21      The Supreme Court has consistently refused to impose a "bright

22 line ratio."  <u>Campbell</u>, 538 U.S. at 425.  Despite the High Court's

23 unwillingness to establish any sort of calculable formula for lower

24 courts to determine what ratios would be unacceptably high, the

25 _____

26 Keller.

1  Court has explained that "single digit multipliers are more likely

2  to comport with due process," and that "in practice, few awards

3  exceeding a single-digit ratio between punitive and compensatory

4  damages . . . will satisfy due process." Id.  And when

5  "compensatory damages are substantial, then a lesser ratio, perhaps

6  only equal to compensatory damages, can reach the outermost limit

7  of the due process guarantee." Id.

8       In the case at bar, the jury awarded Crystal Keller $500,000

9  in compensatory damages and $1,000,000 in punitive damages, a ratio

10  of 2:1 overall, which is certainly within the Constitutional limits

11  enunciated by the Supreme Court.[20]  The court finds that this

12  factor favors plaintiff Crystal Keller, and the court will not

13  disturb the jury's punitive damages award based on this

14  ───────────────

15  [20]   In Planned Parenthood of Columbia/Willamette Inc. v.
    American Coalition of Life Activists, 422 F.3d 949, 962 (9th Cir.

16  2005), the Ninth Circuit held that the proper way to compute the
    ratio between compensatory and punitive damages awards was to
    "compar[e] each plaintiff's individual compensatory damages and

17  punitive damages awards as to each defendant."  "The compensatory
    award to each plaintiff is the denominator in the ratio for each

18  defendant." Id. at 960, n.6.  See Transgo, Inc. v. Ajac
    Transmission Parts Corp., 768 F.2d 1001, 1024-25 (9th Cir. 1985)

19  (basing denominator in ratio on the amount for which each defendant
    is jointly and severally liable).

20       In the case at bar, because the jury verdict form did not
    specify the amount for which each defendant is jointly and

21  severally liable in compensatory and punitive damages, the court
    concludes that $500,000 is the amount for which defendants are

22  jointly and severally liable to Crystal Keller in compensatory
    damages and that $1,000,000 is the amount for which defendants are

23  jointly and severally liable in punitive damages.  In like manner,
    $100,000 is the amount for which defendants are jointly and

24  severally liable to Dennis Keller in compensatory damages and
    $1,000,000 is the amount for which defendants are liable to him in

25  punitive damages.   The damages ratio for Crystal Keller is 2:1
    based on this analysis, and the damages ratio for Dennis Keller is

26  10:1.

1  consideration.

2      The punitive damages ratio for Dennis Keller, however is 10:1

3  overall, which fails Constitutional muster.  As the court explained

4  to the parties during oral argument, the jury recognized the

5  distinction between the father's loss and injury and the child's

6  loss and injury when it awarded Crystal Keller $500,000 in

7  compensatory damages and $100,000 to Dennis Keller.  That same

8  judgment, however, was not reflected in the punitive damages award.

9  Even considering all the inferences in favor of plaintiffs, it

10 still appears to the court that the punitive damages award for

11 Dennis Keller is excessive.

12     If this court determines that the evidence supported liability

13 for Dennis Keller, which this court does, but determines that the

14 size of the award is excessive, the Ninth Circuit has held that the

15 court's discretion is somewhat limited:

16          When the court, after viewing the evidence concerning
           damages in a light most favorable to the prevailing
17          party, determines that the damages award is excessive,
           it has two alternatives. It may grant defendant's motion
18          for a new trial or deny the motion conditional upon the
           prevailing party accepting an remittitur. The prevailing
19          party is given the option of either submitting to a new
           trial or of accepting a reduced amount of damage which
20          the court considers justified.

21 Fenner v. Dependable Trucking Co., 716 F.2d 598, 603 (9th Cir.

22 1983)(citing Linn v. United Plant Guard Workers, 383 U.S. 53,

23 65-66(1966); see also 6A James Wm. Moore, et al., Moore's Federal

24 Practice ¶ 59.08[4] at 59:126-27 ("it may be appropriate, where the

25 verdict is excessive, to order a new trial unless the claimant

26 remits a certain sum").  The proper amount of remittitur is the

1   maximum amount sustainable by the evidence.  D&S Redi-Mix v. Sierra

2   Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982).

3       Taking the evidence as a whole, the court deems $100,000 to

4   be the appropriate amount of punitive damages for Dennis Keller.

5   If he accepts the remittitur, the punitive damages for him will be

6   reduced to $100,000.  If he does not accept the remittitur, a new

7   trial will be held limited to the question of a proper punitive

8   damages award.[21]

9   ////

10  ////

11  ////

12  ////

13  ////

14  ////

15  ////

16  _____

17      [21]  The court notes that the third factor to be considered in
    assessing the reasonableness of a punitive damages award is the
18  disparity between the punitive damages award and civil penalties
    imposed in comparable cases.  Campbell, 538 U.S. at 428 (citing
19  Gore, 517 U.S. at 575).  The court, however, has been unable to
    locate similar cases where compensatory and punitive damages awards
20  were imposed.  Defendants cite a number of police cases involving
    illegal strip searches cases and police brutality, which the court
21  finds to be markedly different from the case at bar.  Defs.' Mot.
    at 18.  Plaintiffs cite Franet v. County of Alameda Soc. Services
22  Agency, CO2-3787MJJ (N.D. Cal. 2006)(Jenkins, J.), a case in the
    Northern District of California involving the removal of children
23  from the parents in Alameda County.  There, the jury returned a
    verdict of $1,220,000 against a social worker who removed two
24  children from their mother.  Plaintiffs' reliance on Franet,
    however, is misplaced because the court ultimately struck the
25  jury's punitive damages award because plaintiffs failed to tender
    evidence that defendant was motivated by evil intent or reckless
26  or callous indifference to plaintiff's rights.

                                    32

1                                    **III.**

2                               **CONCLUSION**

3        Defendants' motion for remittitur is GRANTED IN PART, and

4   DENIED IN PART as consistent with the order.  All other motions

5   are DENIED.

6        IT IS SO ORDERED.

7        DATED:  July 18, 2006.

8                              LAWRENCE K. KARLTON

9                              LAWRENCE K. KARLTON
                               SENIOR JUDGE
10                             UNITED STATES DISTRICT COURT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26